**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-4409**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ABEL GASPAR, JR.,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (1:22-cr-00257-LCB-1)

_____

Argued:  October 29, 2024                    Decided:  December 17, 2024

_____

Before NIEMEYER, RUSHING, and HEYTENS, Circuit Judges.

_____

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge Niemeyer and Judge Heytens joined.

_____

**ARGUED:** John Archibald Dusenbury, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant.  Jacob Darriel Pryor, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:** Louis C. Allen, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant.  Sandra J. Hairston, United States Attorney, Margaret M. Reece, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

_____

RUSHING, Circuit Judge:

Defendant Abel Gaspar, Jr. appeals his prison sentence for participating in a drug conspiracy. Gaspar claims only that the sentencing court did not adequately address his argument about entering the conspiracy under duress. Finding the district court's sentencing explanation adequate, we affirm.

I.

In early 2022, Gaspar and his co-defendant, Sergio Emmanuel Cervantes Moran, sold methamphetamine to undercover officers and their sources several times. We briefly summarize those encounters.

On January 26, 2022, a confidential source spoke with drug dealer Victorino Mondragon about buying methamphetamine. The confidential source agreed to meet Mondragon's associates at a Walmart parking lot in Sanford, North Carolina. Gaspar and Moran arrived in the parking lot as planned, where Gaspar loaded 111 grams of methamphetamine "ice" into a shopping cart and the confidential source paid him $1,800.

On February 15, 2022, the confidential source arranged another deal with Mondragon, this time a sale to an undercover officer from the Drug Enforcement Administration (DEA). Later that day as promised, Gaspar met the DEA officer at a parking lot in Raleigh, North Carolina. Gaspar delivered 419 grams of methamphetamine "ice" to the DEA officer in exchange for $3,500.

In late February 2022, law enforcement learned that Gaspar was going to Atlanta, Georgia, on February 24 to retrieve a drug shipment related at least in part to an additional transaction the DEA officer and Moran had discussed. On February 25, a police officer

2

pulled Gaspar over for speeding in Greensboro, North Carolina. Gaspar was the vehicle's sole occupant. He fled on foot, leaving his vehicle behind. A search revealed 2,002 grams of methamphetamine "ice" on the passenger floorboard, 23 grams of methamphetamine in the center console, a loaded Glock 19 firearm with a round in the chamber, approximately 12 grams of marijuana, and $1,096 in cash.

On May 4, 2022, officers arrested Moran, who confirmed Gaspar's involvement in the operation. The same day, law enforcement executed a search warrant at Gaspar's home in Chapel Hill, North Carolina. Gaspar, his girlfriend, and their two young children were present. Officers found 28 grams of cocaine hydrochloride packaged in plastic bags in Gaspar's kitchen, along with $6,780 in cash. More drugs and paraphernalia were scattered throughout the house, including 56 grams of marijuana, loose white powder, and a digital scale. Officers also recovered four high-capacity rifle magazines, an empty Glock .357 Sig magazine, and damaged body armor.

A federal grand jury indicted Gaspar and Moran each on one count of conspiring to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Gaspar pled guilty.

In the presentence investigation report (PSR), the probation office calculated a total offense level of 37 and criminal history category of V, yielding a Sentencing Guidelines range of 324 to 405 months' imprisonment. But the probation office recommended a downward variance to 210 months' imprisonment. According to the PSR, Gaspar's criminal history "indicate[d] a consistent pattern of drug and firearm related offenses" and

"no prior periods of imprisonment ha[d] deterred [him] from returning to this type of conduct." J.A. 107. However, the PSR also noted that Gaspar had a supportive family and would benefit from substance abuse treatment.

Gaspar filed a presentencing memorandum requesting the court vary further downward to 120 months' imprisonment. He highlighted several factors in support, including his ministerial role in the drug-trafficking operation and childhood abuse. Of note to this appeal, Gaspar also claimed that he participated in the conspiracy out of fear for his family's safety. He now contends this final argument was the "most salient." Opening Br. 28.

According to Gaspar, his involvement in the drug conspiracy stemmed from a phone call with his father months before the charged offense. His father, who lived in Mexico, told Gaspar that a gang was demanding money from local businesses, including his own. Gaspar's father worried about affording to make payments to the gang. Upon hearing this news, Gaspar confided in Moran, who frequently traveled to Mexico. Moran responded that he would "take care of this issue." J.A. 89. A few months later, Gaspar's father reported that the gang had stopped harassing him, even though it continued to require payments from other businesses. Gaspar inferred that Moran had caused the threats to stop.

In Gaspar's telling, sometime later Moran approached Gaspar about joining the drug conspiracy and, although Gaspar initially declined, he eventually caved because Moran reminded him of the favors Moran had done for his family. These reminders, Gaspar asserted, were "tinged with threats that Moran was able to do great harm to Gaspar and/or his family members by simply making a phone call." J.A. 117. Gaspar argued that this

4

"implied threat" "prompted and permeated" his "entry and continued participation" in the conspiracy. J.A. 117.

At sentencing, the district court began by acknowledging that it had received and read Gaspar's memorandum. The court then adopted the PSR without objection. At Gaspar's request, the court held a brief bench conference where counsel acknowledged Gaspar's continuing concern for his family's safety. After the conference, the district court heard from the parties regarding the appropriate sentence. Gaspar echoed the arguments in his presentencing memorandum, reciting the story about his father's experience with the Mexican gang and calling Moran's implied threats the "driving force" that caused him to join and remain in the conspiracy. J.A. 131.

The Government opposed Gaspar's requested variance and sought a variant sentence between 210 and 262 months' imprisonment. Disputing the idea that Gaspar reluctantly joined the conspiracy, the Government noted that Gaspar was "not new" to dealing and possessing drugs, as demonstrated by his criminal history, which included drug-related offenses. J.A. 140. The Government further observed that Gaspar had been undeterred by his previous punishments and by encounters with law enforcement leading up to his arrest. In addition to Gaspar's February 2022 evasion of an officer, the Government also cited a traffic stop on April 15, 2022. During that stop, Gaspar's young children were in the vehicle and law enforcement found 132 grams of marijuana, a drug ledger, a digital scale, and $680 in cash.

On rebuttal, Gaspar resisted the notion that the offense was "a continuation of a pattern that started long ago," noting that his prior offenses involved comparatively small

5

drug quantities.  J.A. 141.  Speaking on his own behalf, Gaspar apologized to his family

and requested leniency.

The district court announced a sentence of 188 months' imprisonment, varying

downward from the Guidelines range of 324 to 405 months.  The court stated that it had

considered the Guidelines range and the 18 U.S.C. § 3553(a) sentencing factors.  The court

then explained:

> This is a serious offense.  We have heard a lot about the issues of Mr.
> Gaspar.  What I didn't hear a lot about is how the communities are affected
> by the level of drugs that he helped to put into the community.  This Court
> is also concerned about not only the amount of drugs, which is significant—
> his role in this was significant.  Even though it does not rise to the level of
> him being a supervisor in this, this man was driving to Atlanta to bring drugs
> back into our community and destroy the communities in which we all live,
> and the Court must handle that in a very serious way.

J.A. 145.  Continuing, the court discussed its concerns about Gaspar's firearms in

connection with his drug trafficking and the fact that Gaspar exposed his children to

weapons and a high volume of drugs.  The court further observed that Gaspar had not been

deterred by his limited time in prison.

Regarding the extent of the variance, the district court explained that a sentencing

disparity might result if it imposed a higher sentence based on the purity of the

methamphetamine "ice" involved in Gaspar's offense.  The court also considered as

mitigating factors Gaspar's early exposure to drugs as a child, his current family support,

and what counsel had "discussed with the Court," an apparent reference to the bench

conference.  J.A. 145.  Lastly, the court addressed defense counsel directly, stating:

> [L]et me go back just a minute.  I do want you to know that a part of this
> reduction is due to what you shared with me at the bench.  The Court did take

that into consideration, but I also took into consideration that he -- his involvement with drugs came long before the events that happened in 2022. So the Court did take all of that into consideration.

J.A. 148. Accordingly, the district court concluded that a sentence of 188 months was "sufficient and not greater than necessary in order to meet the sentencing objectives." J.A. 147.

## II.

On appeal, Gaspar argues solely that the district court failed to adequately address his assertion that fear of Moran drove him to join the conspiracy. We review all criminal sentences for reasonableness "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).

A sentencing court must state "the reasons for its imposition of the particular sentence," 18 U.S.C. § 3553(c), "to allow for meaningful appellate review and to promote the perception of fair sentencing," *Gall*, 552 U.S. at 50. "When a defendant offers non-frivolous reasons for imposing a sentence outside the Guidelines range, 'a district judge should address the party's arguments and explain why he has rejected those arguments.'" *United States v. Arbaugh*, 951 F.3d 167, 174 (4th Cir. 2020) (quoting *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009)). This admonition, however, "focuses on the whole of a defendant's argument and does not require the court to address every argument a defendant makes." *Id.*; *see United States v. Powers*, 40 F.4th 129, 137 (4th Cir. 2022) ("[W]hen a district court addresses a defendant's central thesis, it need not address separately every *specific* claim made in support." (internal quotation marks and brackets omitted)). Further, "we do not evaluate a court's sentencing statements in a vacuum" but

7

may discern the court's rationale from the "context surrounding [its] explanation." *United States v. Montes-Pineda*, 445 F.3d 375, 381 (4th Cir. 2006).

Applying this standard, we are satisfied the district court adequately considered Gaspar's mitigation argument in fashioning its below-Guidelines sentence. At sentencing, the parties presented competing narratives about how Gaspar became involved in the conspiracy. Gaspar claimed he joined out of fear for his father's safety. The Government responded that his intentions were not so pure, highlighting his prior drug-related offenses. In announcing the sentence, the district court acknowledged both arguments. The court stated that it read Gaspar's presentencing memorandum, which detailed his father's circumstances and Moran's implied threat. The court emphasized that the downward variance was informed by the bench conference, where defense counsel told the court that Gaspar feared reprisal to his family. Yet, the court explained, it "also took into consideration" that Gaspar's "involvement with drugs came long before" the charged conspiracy. J.A. 148. Thus, the court was not convinced that duress entirely explained Gaspar's participation in the criminal conduct. Taken as a whole, these statements assure us that the district court considered and responded to Gaspar's core premise that threats to his family mitigated his actions.

To be sure, the court did not expressly reference Gaspar's father or his specific contention that Moran implicitly threatened him before he joined the conspiracy. But context demonstrates the court meaningfully considered Gaspar's "central thesis" and so was not required "to address separately" each supporting fact. *United States v. Nance*, 957 F.3d 204, 214 (4th Cir. 2020). Gaspar raises no further challenge to his sentence, and the

8

record otherwise shows an individualized assessment of the case and a thorough explanation of the sentence imposed.  We therefore cannot say Gaspar's sentence is procedurally unreasonable.

The district court's judgment is

*AFFIRMED*.